2GUIDRY, J.
Debtor company contests the amount calculated by the trial court as the sum due on an outstanding debt owed to a corporation in liquidation. For the following reasons, we find merit in the appellant’s contention and modify the trial court’s judgment accordingly.
FACTS AND PROCEDURAL HISTORY
In 1995, Louisiana Eggs, Inc. (Louisiana Eggs) was formed to engage in the business of buying and processing “nest run eggs”[1] and reselling those (shell) eggs to distributors and retail establishments, such as restaurants and grocery stores. The stockholders of Louisiana Eggs were Herbert Holman, George Holman and Joseph Gunter, each owning an equally divided number of shares in the company. Herbert Holman also acted as president of the company. Louisiana Eggs’ principal place of business was in Calcasieu, Louisiana, in a facility leased from Gunter Food Products, a corporation in reorganization (bankruptcy) and owned by Margaret and Ken Gunter, Joseph Gunter’s parents. Herbert Holman resided in Hartwell, Georgia, and thus, Margaret and Ken Gunter conducted the day-to-day operations of Louisiana Eggs.
As previously stated, Louisiana Eggs supplied shell eggs to distributors and retail customers, such as Gunter Farms, Inc., a company that primarily engages in the selling of boiled and peeled (hard cooked) eggs. Gunter Farms’ principal place of business is in Baton Rouge, Louisiana, and its sole shareholder is Charles McCoy. Joseph Gunter, who holds no ownership interest in Gunter Farms, acts as the company’s president, and Charles McCoy is the company’s chief executive officer.
IsAround September of 1996, Herbert Holman became concerned when he discovered that Louisiana Eggs’ accounts receivable had grown to a considerable sum, thereby reducing the operating capital of the company. Fearing that the high balance of the company’s accounts receivable would adversely affect the likelihood of Louisiana Eggs’ fine of credit being renewed, Herbert Holman met with the officers of Louisiana Eggs’ largest debtor, Gunter Farms.
As a result of the meeting, Joseph Gun-ter and Charles McCoy agreed to grant Louisiana Eggs a security interest in the following collateral: A 1993 Sanova SB SC & SP800 Model 841 Egg Machine; a 1984 Volvo Truck; and deposit accounts. Herbert Holman was told that Louisiana Eggs was being granted a first lien against the collateral. Charles McCoy and Joseph Gunter executed a commercial security agreement (UCC 17-1124229) granting Louisiana Eggs a security interest in the aforementioned collateral on September 6, 1996, and filed the agreement with the East Baton Rouge Parish Clerk of Court on September 26,1996.
In November 1996, Herbert Holman learned that Louisiana Eggs’ line of credit would not be renewed, and finding that it was no longer feasible to operate the business, he decided to declare bankruptcy on behalf of Louisiana Eggs. While in liquidation, Louisiana Eggs, through its court-appointed liquidators, Herbert Holman and George Holman, attempted to collect $92,521.75 from Gunter Farms as the balance due on its account. When Gunter Farms contested the amount owed, Louisiana Eggs attempted to execute against the *402 collateral in which it had been granted a security interest. At that time, Louisiana Eggs learned that Joseph Gunter and Charles McCoy had canceled the September 6, 1996 security agreement on November 13, 1996. Louisiana Eggs also learned that the September 6, 1996 security agreement was not the first lien against the collateral pledged by 14Gunter Farms, but a previous security interest in the collateral had been granted in favor of Charles McCoy on February 24, 1993 (UCC 17-1084154).
Louisiana Eggs, through Herbert Holman and George Holman, filed suit against Gunter Farms, Charles McCoy and Joseph Gunter, in their individual capacities, on August 22,1997. In its petition, Louisiana Eggs asserted that Gunter Farms was indebted to Louisiana Eggs in the amount of $92,521.75, and requested that the security interest granted Louisiana Eggs by Gun-ter Farms on September 6, 1996, be reinstated and ranked above any other lien encumbering the collateral. As a final prayer, Louisiana Eggs requested that a writ of seizure and sale be issued for the sale of the collateral listed in the September 6, 1996 security agreement. By an’ amended petition filed February 4, 1998, Louisiana Eggs asserted that Charles McCoy and Joseph Gunter were individually hable for any damages suffered by Louisiana Eggs based on their fraudulent misrepresentation that the September 6, 1996 security agreement was the first encumbrance of the collateral listed therein.
A bench trial was held on September 1, 2000, at the conclusion of which the trial court rendered judgment in favor of Louisiana Eggs, finding Gunter Farms liable to Louisiana Eggs for the sum of $92,521.75. The trial court ordered the reinstatement of the September 6, 1996 security agreement, as having been improperly canceled, and further ordered that the security agreement maintain the ranking privilege it had acquired when first filed. The trial court also ordered the issuance of a writ of seizure and sale of the collateral listed in the September 6, 1996 security agreement. Finally, the trial court dismissed all claims against Charles McCoy and Joseph Gunter individually.
Gunter Farms suspensively appealed the judgment of the trial court, and Louisiana Eggs, through its liquidators, answered the appeal.
^ASSIGNMENTS OF ERROR
In lodging this appeal, Gunter Farms basically contests the trial court’s determination that it owed the full amount of $92,521.75 based on the evidence presented. In answer to the appeal, Louisiana Eggs asserts that the trial court erred in fading to award attorney fees pursuant to provisions of the September 6, 1996 security agreement.
DISCUSSION
In proving an open account, plaintiff first must prove the account by showing that the record of the account was kept in the course of business and by introducing supporting testimony regarding its accuracy. Once a prima facie case has been established by a plaintiff-creditor, the burden shifts to the debtor to prove the inaccuracy of the account or to prove that the debtor is entitled to certain credits. Heritage Worldwide, Inc. v. Jimmy Swaggart Ministries, 95-0484, p. 5 (La.App 1st Cir. 11/16/95), 665 So.2d 523, 527, writ denied, 96-0415 (La.3/29/96), 670 So.2d 1233. The parties do not dispute that Gunter Farms had an account with Louisiana Eggs, whereby Gunter Farms was supplied with shell eggs on credit, rather the dispute is to the amount due.
At the trial of this matter, only two witnesses were called to testify, Herbert *403 Holman and Joseph Gunter. To prove the amount owed, Herbert Holman produced an itemized listing of the invoices issued to Gunter Farms to substantiate the amount claimed by Louisiana Eggs to be due on Gunter Farms’ account. Louisiana Eggs also submitted, as exhibit P-1, copies of the actual invoices from which Herbert Holman compiled P-2, the itemized listing.
Gunter Farms, in an attempt to disprove the accuracy of the record submitted by Louisiana Eggs, pointed out some discrepancies between the total amounts shown on certain dates as listed on exhibit P-2, and those shown to be owing on two other financial documents compiled by Herbert Holman on behalf of Louisiana | fiEggs. The first document, an aging accounts receivable list marked as exhibit D-2, gives a monthly listing of all accounts receivable held by Louisiana Eggs. At trial, Gunter Farms questioned Herbert Holman regarding the last three pages of the document in which it was shown that in the months ending July 31, 1996 and October 31, 1996, no outstanding balance over 30 days was shown for Gunter Farms. However, on the last page of the document for the month ending November 20, 1996, the amount of $83,167.15 appears in the column for balances over thirty days.
Herbert Holman explained the discrepancy by stating that at the time he compiled the aging accounts receivable list, he did not have the individual invoices in his possession. And indeed, the first page of the aging accounts receivable list contains the following statement: “All lists were prepared from data submitted by Margaret Gunter, therefore if any formal list exist (sic) for other months the copys (sic) should be in the Calcasieu office.”
The second document by which Gunter Farms sought to impeach the itemized listing submitted by Louisiana Eggs was exhibit D-3, Louisiana Eggs’ financial statement for the month ending July 31, 1996. As of July 31, 1996, Louisiana Eggs’ financial statement indicated that the total accounts receivable (incorrectly labeled notes receivable) for Gunter Farms was $90,680.31, which amount differed for the amount listed on both documents D-2 and P-2 for approximately the same date. Herbert Holman’s explanation for the discrepancy in that document was to again note that he drafted the document based on information supplied to him by Margaret and Ken Gunter. He testified, “[t]he only thing I did not get specifically individually were sales invoices and, obviously, not detailed subsidiary ledgers on sales.” Herbert Holman further testified that sometime after November 1996, he asked Margaret Gunter to box up all of the company’s paperwork left in the Calcasieu office and send it to him in Georgia, which is when 17he received the invoices from which he compiled the itemized listing marked as exhibit P-2.
Gunter Farms further questioned the accuracy of the individual sales invoices submitted by Louisiana Eggs in exhibit P-1. Both Herbert Holman and Joseph Gun-ter testified that prior to May 1996, Gunter Farms sold both shell and hard cooked eggs. However, after that date, Louisiana Eggs took over the distribution of shell eggs, while Gunter Farms focused primarily on supplying hard cooked eggs. Furthermore, both men testified that sometime during or after May 1996, Louisiana Eggs began paying Gunter Farms to deliver shell eggs to its Baton Rouge customers.
However, in regard to whether this change affected the billing practices of Louisiana Eggs, Joseph Gunter testified that after May 1996, a portion of the billing invoices issued to it listed shell eggs that were given to Gunter Farms for delivery to Louisiana Eggs’ retail customers in *404 Baton Rouge. He explained that by examining the individual invoices, orders of eggs that were listed on the invoices based on size or listed in quantities other than by the pallet, cart or dolly, were for Louisiana Eggs’ retail customers in Baton Rouge. Joseph Gunter, therefore, stated that portions of the amounts billed on some of the invoices were improperly credited to Gun-ter Farms when actually attributable to Louisiana Eggs’ Baton Rouge retail customers.
Herbert Holman, on the other hand, insisted that it was Louisiana Eggs’ practice to bill customers for all eggs delivered to them. Thus, Herbert Holman testified that exhibit P-2, an itemized listing he compiled based on the individual sales invoices issued to Gunter Farms, accurately reflected the balance due. The evidence in the record reveals that each invoice was written by either Ken or Margaret Gunter and itemized eaeh egg order according to either size or packaging with one grand total listed at the bottom of each invoice. Although separate totals | sare indicated on the invoice for quantity (marked “loose” for those eggs Joseph Gunter alleges were for Louisiana Eggs’ customers and “etn” for those eggs Joseph Gunter insisted were for Gunter Farms), there is no separate total given for cost.
The amount of an account is a question of fact that may not be disturbed absent manifest error. Heritage Worldwide, Inc., 95-0484 at 5, 665 So.2d at 527. The trial court, in considering the aforementioned evidence, found Gunter Farms was indebted to Louisiana Eggs in the amount of $92,521.75, as indicated on exhibit P-2. We find no error in the trial court’s decision to credit the evidence and testimony of Louisiana Eggs over that presented by Gunter Farms in finding that a prima facie case was established. However, we do find that the trial court erred in not allowing Gunter Farms a credit to the extent proven by it since there is nothing in the record to disprove Gunter Farms’ entitlement to the credits.
At trial, Herbert Holman testified that to the best of his knowledge, any credit given to, or payments made by, Gunter Farms was reflected on exhibit P-2. On reviewing exhibits P-2, P-1 and P-7, we note that none of the credit invoices, introduced by Gunter Farms as exhibit D-6, is reflected on exhibit P-2.[2] Thus, although we agree with the trial court that the introduction of exhibits P-1, P-2 and P-7, along with Herbert Holman’s supporting testimony, was sufficient to establish Louisiana Eggs’ prima facie claim, we find that the trial court erred in not finding that Gunter Farms was entitled to certain credits against the amount owed based on the evidence submitted by it as exhibit D-6. We thus conclude that Louisiana Eggs’ recovery should be reduced by the amount of credits proven by Gunter 19Farms.
As for Louisiana Eggs’ answer to the appeal, we also find merit in its contention that the trial court erred in not awarding it attorney fees pursuant to the September 6, 1996 security agreement. We find that Louisiana Eggs is entitled to attorney fees under Section 10, subparts *405 (B) and (D) of that document. Section 10(B) states that in the event of a default, the Secured Party has a right to accelerate payment of all amounts owed by the Debt- or, and thereby foreclose on the collateral. In the event of such foreclosure, Section 10(B) states that the Secured Party is entitled to, among other costs and expenses, attorney fees. Section 10(D) states the “Debtor shall be liable for and agrees to pay on demand the reasonable expenses incurred by Secured Party in enforcing its right and remedies, in retaking, holding, ... of the Collateral, or like expenses, including without limitation, attorney’s fees and legal expenses incurred by Secured Party.”
Although the main focus of the trial in this matter was to prove the amount owed by Gunter Farms on its accounts receivable, Louisiana Eggs additionally demanded and was granted relief regarding the collateral pledged in the September 6, 1996 security agreement. Therefore, based on the relief requested by Louisiana Eggs and granted by the trial court in regard to the collateral listed in the September 6, 1996 security agreement, we find that Louisiana Eggs is entitled to reasonable attorney fees pursuant to the agreement. However, because the record lacks evidence regarding the value and the extent of the services provided by counsel for Louisiana Eggs, we must remand this matter to the trial court for an evidentiary hearing to determine reasonable attorney fees. See City of New Orleans v. Condon, 600 So.2d 78, 81 (La.App. 4th Cir.), writ denied, 605 So.2d 1130 (La.1992).
^CONCLUSION
Having found that the trial court erred in failing to reduce the sum owed to Louisiana Eggs based on the credits proven by Gunter Farms, we amend the judgment to award Louisiana Eggs the sum of $83,033.50, reflecting a credit in favor of Gunter Farms in the amount of $9,488.25. We also reverse that portion of the trial court’s judgment denying Louisiana Eggs’ request for attorney fees and hereby remand this matter to the trial court for a determination of a reasonable amount of attorney fees to award. All costs of this appeal are to be equally divided among the parties to this appeal.
AMENDED IN PART, REVERSED IN PART AND REMANDED.

. A "nest run egg” is described as eggs that come straight from the hens, unwashed and unmeasured. Louisiana Eggs, Inc. owned a grading machine that would wash, weigh and separate the eggs into various sizes for subsequent distribution as shell eggs.

. We observe that exhibit P-7 contains several invoices dated before May 1996, with attached payment receipts, that were not included on the itemized listing, P-2. However, neither party questioned the failure to include these additional invoices and payments on P-2. Except for invoice number 12301 in the amount of $5,197.48, dated March 26, 1996, we note that the invoices and payments listed in P-2 largely correspond to the invoices found in exhibits P-1 and P-7, excluding the invoices previously mentioned. We further note that the amount of invoice number 12301 is canceled out by a credit in favor of Gunter Farms for $5,197.48 on August 20, 1996, as shown on P-2.